Jerry D. WEAST,[1] et al.   Plaintiffs

v.

Brian SCHAFFER, et al.   Defendants

No. CIV. PJM 99–15.

United States District Court,
D. Maryland.

Nov. 25, 2002.

1.   Plaintiff Weast is the Superintendent of the Montgomery County, Maryland Public School System (MCPS).   Plaintiffs will be referred to collectively hereinafter as "MCPS."

Zvi Greismann, Esquire, Rockville, MD, Jeffrey A. Krew, Esquire, Columbia, MD, for Plaintiffs.

Michael J. Eig, Esquire, Haylie Michelle Iseman, Esquire, Chevy Chase, MD, for Defendants.

2. The first time this case was before him (*Schaffer I*), the ALJ denied the parents reimbursement. Finding that assignment of the burden of proof in the case was "critical" to his decision and assigning that burden to the parents, he concluded that they had failed to demonstrate that the Individualized Educational Plan (IEP) devised for Brian was not reasonably calculated to provide educational benefit or that the placement offered by MCPS was not appropriate to provide for the child's education in accordance with the IDEA.

Brian's parents appealed the decision to this Court, which granted their motion for summary judgment and issued an opinion reallocating the burden of proof to MCPS. *See Brian S. v. Vance*, 86 F.Supp.2d 538 (D.Md. 2000). Based on that reallocation of the burden of proof, the case was remanded to the ALJ for further proceedings. Notwithstanding the apparent interlocutory nature of the Court's decision, MCPS took an appeal to the Fourth Circuit. While that appeal was pending, the ALJ considered the case anew and applied this Court's revised burden of proof scheme. Revisiting his earlier decision, the ALJ reversed himself and concluded that the proposed IEP would not have provided Brian with a FAPE for 1998–99. However, the ALJ also concluded that, while Brian's parents were entitled to reimbursement for the private placement, since they never seriously contemplated placing him in public school,

## OPINION

MESSITTE, District Judge.

### I.

The parents of Brian Schaffer, a child with a disability as defined in the Individuals With Disabilities Education Act (IDEA), 20 U.S. § 1400, *et seq.*, disagreed with the Montgomery County, Maryland, Public School system (MCPS) that it offered Brian a Free Appropriate Public Education (FAPE) for the school year 1998–99. As a result, the parents unilaterally placed Brian in private school for that year and sought reimbursement pursuant to the Act. With the case before him for a second time, the Administrative Law Judge (ALJ) held that MCPS had not provided Brian a FAPE,[2] but awarded the parents reim-

they should receive only no more than one-half of the tuition paid for Brian's private education for the indicated school year.

The Fourth Circuit, viewing the case in that posture, ruled:

> In light of this development, we vacate the decision of the district court and remand to that court with directions that any issue with respect to the proof scheme in this case be consolidated with the consideration on the merits. At this stage, it remains unclear what role, if any, the allocation of the burden of proof will have on the final adjudication of Brian's claim. Moreover, there may well be cross-appeals of the ALJ's decision since neither party prevailed fully at the hearing stage. If this court is to address the issue of who has the burden of proof in challenging an initial IEP, it should be in the context of a matured case or controversy rather than in the piecemeal fashion in which this case now appears before us. Accordingly, the judgment of the district court is vacated and remanded for further proceedings consistent with this opinion.

*Schaffer v. Vance*, 2 Fed. Appx. 232, 2001 WL 22920 (4th Cir.2001).

The ALJ has now rendered his decision on remand (*Schaffer II*) and the parties have cross-appealed that decision. As the Court will discuss presently, the issue of which side bears the burden of proof was once again critical to the ALJ's decision.

bursement for only one-half the year's tuition (*Schaffer II*). The parents have appealed the latter decision. They also ask, by way of a motion for preliminary injunction, that MCPS be required to fund Brian's placement at private school for the school years 1999–00 and 2000–01. MCPS has appealed the decision of the ALJ to the extent that he awarded the parents any reimbursement at all.

The parties have filed Cross–Motions for Summary Judgment.[3]

The Court will GRANT the parents' Motion for Summary Judgment and will AFFIRM the finding of the ALJ that MCPS did not provide Brian with a FAPE for 1998–99. It will REVERSE the ALJ's decision insofar as he ordered reimbursement for only one-half of the school year and will DIRECT that the parents be reimbursed for the entire 1998–99 school year. The parents' Motion for Preliminary Injunction, asking that they be reimbursed for the school years 1999–00 and 2000–01, will be DENIED.

The Cross–Motion of MCPS for Summary Judgment will be DENIED.

## II.

### A) *Schaffer I*

Brian, who was 14 years old in 1998–99, is learning-disabled, language-impaired and other health impaired. He has been diagnosed as having attention deficit hyperactivity disorder and needs special education and related services to benefit from school attendance. From kindergarten through seventh grade, he attended Green Acres School, a private school in Montgomery County where, despite small class size and significant accommodations as well as parentally provided extra services, he did not succeed.

In November 1997, Brian's mother contacted MCPS and requested special education services for him for the 1998–99 school year, submitting outside evaluations in support of her request. After reviewing the outside evaluations and conducting additional tests, MCPS found Brian eligible for special education and proposed a part-time placement at Hoover Middle School, with an alternative placement at the Robert Frost Middle School. This was Brian's initial IEP.

Because they believed the IEP drafted for Brian was not reasonably calculated to provide him with appropriate educational benefit, his parents notified MCPS that they rejected the proposed placement. In May of 1998, they requested an administrative due process hearing. More or less simultaneously, anticipating the beginning of a new school year in the fall, they enrolled him for the 1998–99 school year at the McLean School, a private school for learning and language-disabled students located in Montgomery County.

In *Schaffer I*, in which the ALJ assigned the burden of proof to the parents, the ALJ considered the evidence relative to the "central auditory processing problem" he found Brian had. He cited the testimony of Drs. Ruth D. Spodak and Carol A.

---

3. Summary judgment is appropriate where there is no genuine issue of material fact. Fed.R.Civ.P. 56. The parties apparently agree that such is the case here, the only issue being what conclusions should be drawn from undisputed facts. On the other hand, the Court is also the trier of fact in an appeal from an administrative decision in an IDEA case. Accordingly, the Court can also (and indeed will) judge this appeal as the trier of fact, especially where—as here—the parties have added no evidence to the record beyond what the ALJ had before him. *Cf. Marathon Mfg. Co. v. Enerlite Prod. Corp.*, 767 F.2d 214, 217 (5th Cir.1985) (holding that where the parties stipulate that the court may make findings of fact on the basis of the record at the summary judgment hearing, the court may determine the facts rather than merely whether factual issues exist).

Kamara, Brian's experts on learning disabilities and speech/language pathology respectively, both of whom stated that the IEP proposed for Brian failed to offer an appropriate educational benefit because he required small, self-contained special education classes of a kind not included in the IEP. Dr. Spodak testified that such classes were essential to Brian's education because they would tend to minimize the distractions interfering with his ability to learn. Dr. Kamara testified that his "central auditory processing" problem increased his susceptibility to distractions, necessitating a small, self-contained learning environment.

The ALJ noted that Dr. Spodak's testimony differed in some respects from a report she and members of her staff had written earlier about Brian's learning disabilities. This, along with the fact that she herself had spent only ten minutes with Brian, caused the ALJ to "question[ ] the probative value of Dr. Spodak's opinion." Similarly, the ALJ noted that Dr. Kamara's opinion was compromised to some extent by her acknowledgment of the diagnostic limitations of the test she relied upon in diagnosing Brian's "central auditory processing" problem and by her refusal to offer an opinion as to whether Brian's speech-language disability was mild, moderate, or severe. Finally, the ALJ noted that two experts from MCPS, Dr. Barbara J. Butera, a school psychologist, and Pamala Zahara, a speech pathologist, testified that the IEP was appropriate to Brian's needs and that, in their view, Brian suffered not from a "central auditory processing" problem but from a mild speech-language disability.

The ALJ deemed assignment of the burden of proof in the case to be "critical":

There are experts on both sides in this case who have testified with opposing points of view. The credentials of all of those experts, in their respective fields, were impressive. Because each side's experts have diverging views on the question of what the Child's needs were and which placement would afford the requisite educational benefit for the Child, an assignment of the burden of proof in this case becomes critical.

Placing the burden of proof upon the parents, the ALJ decided that they had not demonstrated that Brian failed to receive a FAPE:

The Parents have failed to persuade the ALJ that the April 6, 1998 IEP was not reasonably calculated to provide educational benefit, or that the placement(s) offered by MCPS are not appropriate to provide for the Child's educational needs in accordance with the IDEA.

Accordingly, the parents' request for reimbursement was denied.

B) *Schaffer II*

In *Schaffer II*, with the burden of proof shifted to MCPS, but without additional evidence being presented, the ALJ revisited the record. Again he found that the core dispute was whether Brian had a "central auditory processing" problem and again he considered the impact, if any, that that disability had on Brian's ability to learn. The ALJ reviewed the testimony of Dr. Kamara, the Schaffers' speech/language pathology and audiology expert, who was critical of the proposed placement of Brian at Herbert Hoover Middle School or the Robert Frost Middle School "because of the risk of simultaneous messages, distractions and possible distortions of audio signals in that setting." He looked again at Dr. Kamara's opinion that the critical need of the child—his "central auditory processing" problem—had not been addressed in the 1998–99 IEP. The ALJ also considered the testimony of the speech/language pathologist for MCPS, Pamala Zahara, who opined that Brian did

not exhibit evidence of "severe auditory processing difficulties related to discrimination at the word level." The ALJ weighed Dr. Kamara's qualifications as a certified audiologist against those of Ms. Zahara as a speech/language pathologist. The fact that Dr. Kamara had conducted a formal comprehensive evaluation of Brian that took four hours to complete as opposed to the informal assessment Ms. Zahara took approximately one hour to make was also taken into account. At the end of the day, the ALJ concluded that "undoubtedly, Dr. Kamara's effort and experience in evaluating the Child was more extensive than that of Pamala Zahara."

Even then, however, the ALJ found that the evidence remained in balance:

> In sum, the weight of the evidence from Dr. Kamara and Pamala Zahara on the usefulness of the SCAN–A and the existence of the Child's unique "central auditory processing" problem, rests in equipose. In resolving the dispute of fact, the ALJ must accept one expert's opinion and reject the other. Unlike the initial hearing, MCPS now bears the burden of proof on facts in dispute. For this reason, the ALJ now accepts the opinion from Dr. Kamara that the Child has an unique "central auditory processing" problem and rejects Pamala Zahara's opinion to the contrary. Having reversed the factual finding on that initial point, the ALJ will further accept, the opinion of Dr. Kamara that the Child's unique "central auditory processing" problem has a significant impact on his learning and rejects expert opinion testimony from MCPS to the contrary.

The ALJ also revisited the testimony of Dr. Spodak, Brian's expert witness in psychology and learning disabilities:

> During her testimony, she opined, consistent with the opinion of Dr. Kamara, that the Child would receive only trivial or minimal educational benefit, not the appropriate benefit, in a placement at either the Herbert Hoover Middle School or the Robert Frost Middle School. Dr. Spodak would not recommend that the Child be provided special education services in an "inclusion model" setting.[4] Dr. Spodak believes that the Child's educational needs can only be met in small, self-contained special education classes. Small, self-contained special education classes in all academic settings are needed to minimize distractions in order for the Child to be available for learning.

The ALJ gave the MCPS experts their due, but found their opinions wanting:

> MCPS special education experts testified that many of the disabled students in the "inclusion model" setting at the Herbert Hoover Middle School or the Robert Frost Middle School have a "profile" similar to the Child's abilities, disabilities and educational needs. MCPS special education experts testified those students with a "similar profile" are successful learning in that setting. This testimony estimates the Child's projected learning in the "inclusion model" setting compared with a group of students with whom the experts are familiar on the basis that the Child has a "similar profile." This may be a valid comparison if the Child's needs are correctly

---

**4.** Under the "inclusion model" at Herbert Hoover, Brian would have been in a class of between 24–28 students. Those classes would be co-taught by a certified special education teacher and another teacher (not certified as a special education teacher). The certified special education teacher would focus on and provide special education services to 5–6 students in the class who had IEPs. Brian would have been one of those 5–6 students.

identified and properly considered in such "profiling."

However, MCPS experts do not recognize that the Child has an unique central auditory processing problem that has a significant impact on his learning as described by Dr. Kamara. Resultantly, the ALJ is left to question how similar a profile the Child has to those students who are successful at the Herbert Hoover Middle School or the Robert Frost Middle School. The failure of MCPS experts to accept and take this need of the Child into their consideration is a factor in evaluating the merit of their opinions.

Dr. Kamara testified that the April 6, 1998 IEP, as drafted, does not recognize the Child's central auditory processing problem as a need to be addressed in the Child's education. The April 6, 1998 IEP had no goals to address the Child's severe auditory deficit (perception of sound), which is responsible for his reading problem, and no goals to address his articulation problem, as found and described by Dr. Kamara. This testimony was not refuted. Having accepted the position that the Child has an unique central auditory processing deficit, the failure of the IEP to recognize and address that deficit is noteworthy.

And, finally, the ALJ reaffirmed the essential equivalence of the evidence:

In sum, the weight of the evidence from the Parents' experts and the experts on behalf of MCPS on the degree of "educational benefit" that the Child could have obtained under the April 6, 1998 IEP, in the "inclusion" setting at either the Herbert Hoover Middle School or the Robert Frost Middle School, rests in equipose. In resolving this dispute, the ALJ must accept the opinion from one side's experts and reject the other. Unlike the initial hearing, MCPS now bears the burden of proof on facts in dispute.

For this reason, the ALJ now accepts the opinions from Dr. Kamara and Dr. Spodak that the Child—given his potential for learning—would not have obtained meaningful educational benefit under the April 6, 1998 IEP in a placement at either the Herbert Hoover Middle School or the Robert Frost Middle School.

Given the findings of fact, herein, MCPS has failed to persuade the ALJ that the April 6, 1998 IEP was reasonably calculated to provide "significant learning" and "meaning educational benefit" and the placement(s) offered by MCPS were appropriate to provide for the Child's educational needs in accordance with the IDEA.

Notwithstanding this conclusion, full reimbursement for Brian's private schooling for school year 1998–99, was denied. Noting that reimbursement is an equitable form of relief, the ALJ concluded on the basis of the evidence that there was "a design by the parents to simply obtain funding from MCPS for a predetermined decision to have the Child attend private school ... The parents did not approach their interaction with MCPS as a partnership in educating the child as a student with disabilities." Accordingly, "[a]s a matter of equity," the ALJ decided to create a "partnership between the parents and MCPS for funding the placement of the Child at the McLean School of Maryland for the 1998–1999 school year." In other words, he directed the school authorities to pay one-half the tuition's costs for the year, the parents would be obliged to assume the other half.

### III.

Interestingly, in its appeal from the ALJ's decision in *Schaffer II,* MCPS does not challenge the Court's earlier decision to allocate the burden of proof to MCPS. Instead it argues that the ALJ misapplied

that burden of proof by materially altering his findings of fact and by making new findings as to the credibility of witnesses where no new evidence was introduced and where the original evidence in favor of MCPS remained "overwhelming." However, despite the failure of MCPS to raise the issue, since the Fourth Circuit vacated the Court's earlier decision regarding the allocation of burden of proof and since the allocation of the burden was as critical to the disposition of *Schaffer II* as it was to *Schaffer I,* the Court must necessarily address the issue again. Only then can the Court determine whether or not the ALJ misapplied that burden, as argued by MCPS.

Brian's parents, while denying that they "predetermined" that Brian would attend private school come what may, insist that their intention is in any event irrelevant. So long, they say, as they cooperated in good faith in the development of an IEP, they are entitled to full reimbursement if Brian was not offered a FAPE, even if they were fixed on private schooling for him all along.

### IV.

■ The Court accepts the ALJ's conclusion in *Schaffer II* that allocation of the burden of proof is critical to the adjudication of Brian's claim. Accordingly the Court reaffirms its earlier decision that, with regard to an *initial* IEP, the burden of proof in the administrative due process hearing that might follow is upon the school district, not upon the parents. The Court embraces the same analysis as before. Thus -

A challenge to an IEP may arise in different settings:

1) The first involves an initial IEP, proposed by the school authorities the first time it is sought for a child, one which the parents disagree with and as to which they seek a administrative due process hearing (the present case);

2) Next is the existing IEP, which at one time was agreed to by everyone, but which either the parents or the school district seeks to change against the wishes of the other, whereupon the matter goes to a due process hearing; and

3) Finally, there is the IEP that has been passed upon by an independent ALJ, which a party seeks to challenge in a court proceeding.[5]

The cases, when considering which side has the burden of proof, do not always distinguish among these settings, but in fact there appears to be reason to do so.

In the last scenario, the law and policy considerations are the most sharply defined. The Fourth Circuit has clearly held that the burden of proof on appeal from an administrative decision is upon the party challenging the decision. *See Barnett v. Fairfax County Sch. Bd.,* 927 F.2d 146, 152 (4th Cir.1991); *Tice v. Botetourt County Sch. Bd.,* 908 F.2d 1200, 1206 n. 5 (4th Cir.1990); *Spielberg v. Henrico County Pub. Sch.,* 853 F.2d 256, 258 n. 2 (4th Cir.1988). This, according to the Fourth Circuit, arises out of deference to the underlying state administrative process. *Tice,* 908 F.2d at 1206 n. 5. That in turn undoubtedly flows from the general belief that, once an impartial judicial hearing has been held and a decision made—even at the administrative level—the burden of overturning the decision ought to be upon the party challenging it.[6]

---

5. There is at least one further scenario, in which both the parents and the school district seek to change an existing plan. Discussion of which party has the burden of proof in that setting is best left for another day.

6. But not all circuits agree that assignment of the burden should be thus. In *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 533 (3d Cir. 1995), for instance, the Third Circuit held that the burden should always be upon the school

Moving to the intermediate scenario, where an existing IEP is sought to be changed, if for no other reason than that it seems "fair[ ]," *Tatro v. Texas*, 703 F.2d 823, 830 (5th Cir.1983), it is not unreasonable to conclude that the burden of persuasion as to the change should be borne by the party seeking the change. Numerous cases so hold. *See, e.g., Salley v. St. Tammany Parish Sch. Bd.*, 57 F.3d 458, 467 (5th Cir.1995); *Doe v. Bd. of Educ.*, 9 F.3d 455, 458 (6th Cir.1993); *Johnson v. Indep. Sch. Dist. No. 4*, 921 F.2d 1022, 1026 (10th Cir.1990); *Alamo Heights Ind. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1158 (5th Cir.1986); *Doe v. Brookline Sch. Comm.*, 722 F.2d 910, 919 (1st Cir.1983); *Tatro*, 703 F.2d at 830.[7]

These authorities are in accord with the observation made by Professor Wigmore that the burden of proof is frequently placed "upon the party to whose case the fact is essential," 9 *Wigmore on Evidence*, § 2486 at 288 (italics omitted). In the context of an IDEA case, this argues for the proposition that the party seeking a change in the IEP should have to explain why the change is appropriate.

Despite this, a number of cases have held that the burden of proof at the administrative level should always lie with the school district, even when the parents are seeking to change an existing IEP. *See Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1398 (9th Cir.1994); *see also Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998); *E.S. v. Indep. Sch. Dist., No. 196*, 135 F.3d 566, 569 (8th Cir.1998); *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 533 (3d Cir.1995); *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1034–35 (3d Cir.1993); *Lascari v. Bd. of Educ.*, 116 N.J. 30, 44, 560 A.2d 1180, 1188 (1989).

The reasoning of these holdings varies from none at all, *i.e.* from mere assertion, to a brief reference to the statutory obligation to accommodate disabled children, to, in a very few cases, a rather elaborate explanation. Among the cases that merely assert that the burden is upon the school district are *Clyde K.*, 35 F.3d at 1398, and *Walczak*, 142 F.3d at 122. In the middle category is *Wall v. Mattituck–Cutchogue Sch. Dist.*, 945 F.Supp. 501 (E.D.N.Y. 1996), to wit:

> It has consistently been held that the burden throughout the administrative process is placed upon the school district. This is in obvious recognition of the school's overarching obligation to attend to the specific educational needs of children with disabilities. *See* S.Rep. No. 94–168 to P.L. 94–142, at 9, *reprinted in* 1975 U.S.C.C.A.N. 1425, 1433 ("It is this Committee's belief that the Congress must take a more active role under its responsibility for equal protection of the laws to guarantee that handicapped children are provided equal educational opportunity.").

945 F.Supp. at 511 (citations omitted).

Undoubtedly the most elaborate rationale was set forth in *Lascari*, which bears quoting *in extenso*:

> [W]e believe it is more consistent with the State and federal scheme to place

---

district. *See also Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1219 (3d Cir.1993).

**7.** It is not always clear from the language of these cases whether they are addressing the burden of proof at the administrative level, in the district court, or both. The cases are often cited, however, as standing for the proposition that the party seeking to change an existing IEP bears the burden of proof at the administrative level. *See, e.g., T.H. v. Bd. of Educ.*, 55 F.Supp.2d 830, 835 n. 5 (N.D.Ill. 1999); *Schmerling v. Anne Arundel County Bd. of Educ.*, Civ. No. WMN 98–2283 slip op. at 5 (D.Md. May 19, 1999); *Manchester Sch. Dist. v. Charles M.F.*, No. CIV. 92–609–M, 1994 WL 485754, at *4 (D.N.H. Aug. 31, 1994).

the burden on the school district not only when it seeks to change the IEP, but also when the parents seek the change.

Various considerations lead us to that conclusion. Underlying the State and federal regulations is an abiding concern for the welfare of handicapped children and their parents. Consistent with that concern, the basic obligation to provide a handicapped child with a free, appropriate education is placed on the local school district. It is the district that must identify handicapped children and then formulate and implement their IEPs. Finally, the regulatory scheme vests handicapped children and their parents with numerous procedural safeguards. Those safeguards include the right to counsel and to the advice of experts, 20 U.S.C. § 1415(d)(1); 34 C.F.R. § 300.508(a)(1); to present evidence and cross-examine witnesses, 20 U.S.C. § 1415(d)(2); 34 C.F.R. § 300.508(a)(2); to "have the child who is the subject of the hearing present," *id.* at § 300.508(b)(1); and to a public hearing, *id.* at § 300.508(b)(2). Like those procedural safeguards, the allocation of the burden of proof protects the rights of handicapped children to an appropriate education.

Our result is also consistent with the proposition that the burdens of persuasion and of production should be placed on the party better able to meet those burdens. In the past, we have placed either the burden of production, *see*

*Ryan v. Mayor & Council of Borough of Demarest,* 64 N.J. 593, 604–05, 319 A.2d 442 (1974), or the burden of proof on the party with the better access to relevant information, *Andersen v. Exxon Co.,* 89 N.J. 483, 500, 446 A.2d 486 (1982); *Brundage v. New Jersey Zinc Co.,* 48 N.J. 450, 475–77, 226 A.2d 585 (1967). The school board, with its recourse to the child-study team and other experts, has ready access to the expertise needed to formulate an IEP. Through the child study team, the board generally has extensive records pertaining to a handicapped child. The board is also conversant with the federal and State laws dictating what the district must provide to handicapped children in order to comply with the EAHCA. *Cf. S–1 v. Turlington,* 635 F.2d 342, 348–49 (5th Cir.) (burden on district to raise question whether student's misconduct is based on handicap because parents lack wherewithal to know rights under EAHCA), *cert. denied,* 454 U.S. 1030, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981), *abrogated on other grounds by Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). By contrast, parents may lack the expertise needed to formulate an appropriate education for their child.

116 N.J. at 44–45, 560 A.2d at 1188.[8]

As to the first scenario—that in which an *initial* IEP is disputed at a due process hearing—all of *Lascari's* considerations came into play but there is more. In the initial situation, unlike the change situa-

---

**8.** This Court would add a further observation: The Congressional statements and declarations that appear at the beginning of the IDEA refer to minority children, *see, e.g.* 20 U.S.C. § 1400(b)(7) to (10), in particular economically disadvantaged minorities. *Id.* at § 1400(b)(8)(C). Strictly speaking, if parents in those categories have the burden of persuasion at the administrative level, their failure to put on a *prima facie* case would mean that the school district could rest without having to produce any evidence in justification of the IEP. On the other hand, parents who can afford to retain counsel and experts, while still having the burden of persuasion, could at least force the school district to produce evidence in support of the IEP. *Query,* whether such a result is fair, apart from whether Congress could have intended it.

tion, the parents have never agreed that the IEP is appropriate. By definition, they have disagreed and sought a determination by an impartial hearing officer, one, it may be noted, who by law may not be associated with the school authority. 20 U.S.C. § 1415(f)(3). In this circumstance, the only sense in which "change" is involved is that the parents wish to change what the school authorities have unilaterally proposed. Since the IEP is supposed to be a joint enterprise, if parents have never agreed to it, it is debatable whether an IEP can even be said to exist. The situation seems much like that in which two parties engage in a dispute, following which litigation is initiated. If one assumes, following Wigmore, that "the party having in form the affirmative allegation" should carry the burden of proof, 9 *Wigmore on Evidence*, § 2486 at 288 (italics omitted), it would seem entirely reasonable to assign the burden to the school authority to affirmatively establish the propriety of the plan it proposes.[9]

As one commentator has pointed out, allocating the burden of proof to the school authority in no way reflects a lack of deference to the expertise of the school authorities. But there may be, she writes, a tendency to "confuse the *Rowley* Court's deference to school officials on methodological matters with matters of burden of proof." Dixie Snow Huefner, *Judicial Review of the Special Educational Program Requirements Under the Education for All Handicapped Children Act: Where*

*Have We Been and Where Should We Be Going?*, 14 Harv. J.L. & Pub. Pol'y 483, 512 (1991). To acknowledge the expertise of school officials is not the same as saying that they should not have to demonstrate to an impartial fact-finder, at least in connection with an initial IEP, that the proposed goals and objectives of the IEP address the student's needs, that the proposed IEP will deliver services to those needs in a way that will provide progress towards those goals and objectives, or that criteria are in place to evaluate the child's progress which can actually measure the extent to which the objectives are obtained. *Id.*

Finally, Wigmore offers this perspective on the burden of proof issue:

> There is . . . no one principle, or set of harmonious principles, which afford a sure and universal test for the solution of a given class of cases. The logic of the situation does not demand such a test; it would be useless to attempt to discover or to invent one; and the state of the law does not justify us in saying that it has accepted any. There are merely specific rules for specific classes of cases, resting for their ultimate basis upon broad reasons of experience and fairness.

9 *Wigmore on Evidence*, § 2487 at 292 (footnotes omitted).[10]

To the extent that the Court writes on a clean slate, therefore, it holds that with regard to an *initial* IEP, experience and

---

**9.** Of course the same argument could be made in support of assigning the burden to the school board at any level—that it should always be required to demonstrate the propriety of the plan that it proposes. That, in fact, appears to be the rationale of those cases that have assigned the burden to the school board at all levels.

**10.** *Accord* Edmund M. Morgan, *Basic Problems of Evidence* 28 (4th ed.1963):

> The truth seems to be, and many of the modern decisions expressly state, that the allocation of the burden is to be determined by considerations of fairness, convenience and policy. Such considerations require the exercise of a sound judgment and prior judicial experience, as revealed in past decisions, has strong persuasive effect.

fairness dictate that the school district should have the burden of proof at any administrative due process hearing that might follow. In contrast, not only experience and fairness but clear case law indicate that, when a change is sought in an existing IEP, the party seeking the change should have the burden of proof.

Because the case at bar involved the parents' disagreement with a proposed initial IEP, the Court finds the ALJ correctly assigned the burden of proof to MCPS.

### V.

■ As MCPS points out, "federal courts must accord due weight to state administrative proceedings which are entitled to be considered *prima facie* correct." *See Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir.1991). But what MCPS asks is that the Court defer to the ALJ's findings in *Schaffer I* as opposed to *Schaffer II*. Brian's parents argue, not without reason, that the ALJ's findings in *Schaffer I* are no longer entitled to a presumption of correctness, especially insofar as they were made based upon a misallocated burden of proof. The Court agrees with the parents. Unquestionably the operative administrative decision before the Court is that of *Schaffer II*. If *Schaffer I* has any continuing relevance, it is only be insofar as it may lead the Court not to follow findings in *Schaffer II* because the former seriously undermine the latter.

■ The Court, however, giving due weight to the ALJ's findings in *Schaffer II*, which is to say acknowledging their *prima facie* correctness, chooses to follow those findings. Whatever reservations the ALJ may have had in *Schaffer I* regarding certain aspects of testimony of Brian's experts, the essential and unvarying point of both *Schaffer I* and *Schaffer II* is that the evidence was in equipoise. That clearly means that, with the shifting of the burden of proof to MCPS, a conclusion favorable

to Brian's parents relative to the FAPE question must follow. The Court is not persuaded by the dramatic suggestion of MCPS that the ALJ has "materially altered" the facts. Since the facts have always been, in the ALJ's judgment, in balance, the case could have been decided either way. The ALJ has now opted in favor of Brian and his parents instead of MCPS and the Court is satisfied with that conclusion. The Court concludes that MCPS did not provide Brian with a FAPE for the school year 1998–99.

That aspect of the ALJ's decision will be AFFIRMED.

### VI.

■ The Court takes a different view with regard to the ALJ's decision to reimburse the parents for only one-half of Brian's tuition for the 1998–99 school year.

The ALJ recognized that parents are entitled to be reimbursed by the public education agency for a private placement when the public agency has not provided their child with a FAPE. *Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). But because he determined that reimbursement is "equitable in nature," *Id.* at 374, 105 S.Ct. 1996, and because he found that the parents were always committed to sending Brian to private school come what may, the ALJ concluded that their reimbursement should be limited. MCPS cites authority to the effect that in circumstances such as these—where parents intend to reject any public school placement regardless of the school's recommendation—no reimbursement should be awarded at all. *See, e.g., Tucker v. Calloway County Bd. of Educ.*, 136 F.3d 495, 503, n. 25 (6th Cir. 1998) ("Under IDEA, if the Tuckers unilaterally decided to place Barkley in LCDC, the local school district was not required to pay for that private school

education, even though Barkley had a recognized disability and had been receiving special education services from the local school district."). The Court disagrees with both the ALJ and MCPS.

The Court accepts that Brian's parents were intent on finding a private school for him even as they sought to have him identified as a student with disabilities under IDEA. It is undisputed that they paid a non-refundable enrollment fee to the McLean School knowing that the Admission, Review and Dismissal (ARD) meeting that was going to review Brian's IEP for the 1998–99 school year had not yet taken place.

Nevertheless, on April 6, 1998, the parents attended the ARD committee meeting and indicated that they would review the goals and objectives of the IEP, have private consultants review the IEP, visit the schools to observe the placements offered and thereafter recontact MCPS. From all that appears the parents substantially followed through. They arranged for private consultants to review the IEP, submitted those reviews to MCPS, and Brian's mother visited the Robert Frost Middle School where she met with one of the school's special education teachers.[11] The Court further accepts that the mother told the special education teacher at Frost that she was sure that Frost would not be appropriate for Brian. Finally, the Court accepts the ALJ's finding that the parents did not thereafter recontact MCPS or request any additional services or goals to be added to the child's IEP for the 1998–99 school year.[12] Other than this, there is no suggestion that the parents in any way failed to cooperate in the development of the IEP. On that basis the ALJ found that there was a "predetermined decision" to have Brian attend private school which precluded an award of full funding.

The Court notes, in the context of reviewing this issue that, to the extent that the ALJ's decision involves a conclusion of law as opposed to a finding of fact, it is not entitled to a presumption of correctness. The Court reviews the ALJ's conclusions of law *de novo. Teague Indep. Sch. Dist. v. Todd L.,* 999 F.2d 127, 131 (5th Cir. 1993).

The question presented—and it is essentially a legal one—is whether parents who are committed to placing their child in private school despite what the IEP might ultimately provide (and who may nevertheless proceed with plans for the private placement) are *ipso facto* precluded from

---

**11.** Although the parents failed to visit the Herbert Hoover Middle School, the record does not indicate whether this was the result of a decision of the parents not to cooperate with MCPS, whether the visit was canceled by MCPS, or whether it was canceled by mutual agreement.

**12.** However, the ALJ suggested that MCPS bore some responsibility for this state of affairs:

The conduct of MCPS experts also leaves much to be desired. MCPS experts failed to develop an IEP that was reasonably calculated to provide the Child with "significant learning" and "meaning educational benefit." The Parents' experts had evaluated the Child and provided reports of those evaluations. Those reports were provided to MCPS. The independent assessments of the Child were extensively reviewed and considered by MCPS experts. An MCPS expert accepted the independent psycho-educational evaluation of the Child but rejected the educational setting recommended. An MCPS expert accepted, in-part, the independent speech-language assessment of the Child but rejected the educational setting recommended. MCPS experts made no effort to contact the Parents' experts and discuss those reports and recommendations. Lack of contact by MCPS experts with the Parents experts may have played a role in the failure by MCPS to develop an IEP appropriate to the Child's educational needs and offer an appropriate placement.

receiving full reimbursement for the placement even if it is eventually determined that the school authorities did not provide a FAPE. The Court holds that they are not.

As the Court observed in *Sanger v. Montgomery County Bd. of Educ.*, 916 F.Supp. 518, 527 (D.Md.1996):

Parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of school officials, may still seek reimbursement for any period in which the placement proposed by the school authority violated IDEA. *Sch. Comm. v. Dept. of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Amann v. Stow Sch. Sys.*, 982 F.2d 644 (1st Cir. 1992). They do so, however, at their own risk; if the school authority's placement is ultimately deemed proper, the parents will not prevail.

916 F.Supp. at 527 (footnote omitted).

The critical consideration, as the Court sees it, is not whether the parents have their minds set on private school, but whether they have cooperated in good faith to attempt to develop an IEP to the maximum extent possible. If they have not, they cannot fairly be heard to complain that the school authorities have failed to develop an IEP and consequently have failed to offer a FAPE for their child. But if they have cooperated—even if throughout they have held to the belief that the best the school authorities can offer will not be good enough—they are entitled, acting "at their own risk," to place the child privately, hoping that eventually they will be able to convince an ALJ or a judge that the child was not offered a FAPE. As citizens and taxpayers, *City of Burlington* entitles them to nothing less. If subsequent developments show that the parents were correct all along—that their child was not offered a FAPE—their mental reservations are simply irrelevant. In-

deed, it is quite conceivable that parents who begin the IEP process certain that the school authorities will not be able to produce an acceptable IEP may become convinced in the course of their joint exploratory efforts with the school authorities that an acceptable IEP can in fact be produced. Additionally, parents whose disabled child is already in private school, who may feel that continuing the child in private school remains the best placement for the child, are nevertheless—as citizens and taxpayers—entitled to request the public school to attempt to develop an IEP for the child, one which might well cause them to change their minds and opt for the public instead of the private program. But in no sense should the parents be penalized merely because they may have entertained strong skepticism about the likely effectiveness of the IEP proposed by the public school authorities.

*Sanger v. Montgomery County Bd. of Educ., supra*, presents a useful contrast to the case at bar. In *Sanger*, the parents made it clear throughout the process that they were not inclined to consider the IEP, passing up several opportunities to go before the ARD Committee, choosing not to respond to a letter from the Local Coordinating Council that suggested a residential placement for their child and never seeking to visit the facility where the placement was proposed to be made. They were, accordingly, denied reimbursement.

In the present case, there is no indication in the ALJ's report that the parents' actions in any way thwarted the school system's ability to propose an IEP for Brian. They cooperated fully in attempting to develop the IEP, dubious though they may have been about its ultimate utility. But, as it turns out, and the ALJ has found, they were correct. Their skepticism was justified. The best that MCPS had to offer did not make the grade as a

FAPE. That, in the Court's view, suffices to establish their entitlement. Accordingly, to the extent that the Court is authorized to make factual and legal findings inconsistent with those of the ALJ, it does so on this point. The parents in no way prevented the IEP from being formulated or otherwise failed in good faith to consider it. As a result, they are entitled to full reimbursement for the 1998–99 school year.

The decision of the ALJ will thus be REVERSED insofar as he ordered 50% reimbursement for that school year. MCPS will be ordered to make full reimbursement to the parents for the 1998–99 school year.

### VII.

■ The final matter for consideration is the request of Brian's parents that MCPS be required to pay for Brian's educational placement at the McLean School for the 1999–00 and 2000–01 school years.

They argue that the IDEA provides "stay put" protection for a student's current educational placement as a means of preserving the status quo until the underlying IDEA litigation is resolved, citing *Drinker v. Colonial Sch. Dist.,* 78 F.3d 859, 865 (3rd Cir.1996). *See also* 20 U.S.C. § 1415(j); 34 C.F.R. § 300.526. MCPS argues, to persuasive effect, that Brian's parents have failed to exhaust their administrative remedies for the 1999–00 and 2000–01 school years and are therefore precluded from raising the issue in this proceeding. While MCPS developed IEPs for the school years 1999–00 and 2000–01 and the parents rejected them, they never sought due process hearings as to either.

MCPS prevails on this point. The Fourth Circuit, in the recent case of *MM v. Sch. Dist.,* 303 F.3d 523, 536 (4th Cir. 2002) held that:

When parents of a disabled child challenge multiple IEPs in court, they must have exhausted their administrative remedies for *each academic year* in which an IEP is challenged (emphasis in original).

The parents' request for reimbursement for the school years 1999–00 and 2000–01 will therefore be DENIED.

### VIII.

Summing up:

1) The Court will AFFIRM the decision of the ALJ insofar as he found that MCPS did not provide Brian with a FAPE for the school year 1998–99;

2) It will REVERSE the ALJ's decision with regard to the right of Brian's parents to receive reimbursement for Brian's private school tuition for the school year 1998–99 and will ORDER that they receive full reimbursement for that year;

3) The request of Brian's parents for reimbursement for the school years 1999–00 and 2000–01 will be DENIED.

A separate Order will be ENTERED implementing this decision, including appropriate rulings on the parties' Cross–Motions for Summary Judgment.

### *FINAL ORDER OF JUDGMENT*

The Court has considered pending Motions in the captioned proceeding.

Accordingly it is for the reasons set forth in the accompanying Opinion this 21 day of November, 2002

ORDERED:

1) Defendants' Motion for Summary Judgment (Paper No. 45) is GRANTED:

A) The Court AFFIRMS the decision of the Administrative Law Judge insofar as he found that MCPS did

not provide Brian Schaffer with a FAPE for the school year 1998–99;

B) The Court REVERSES the decision of the Administrative Law Judge insofar as he would award Brian's parents reimbursement for only one-half of the tuition costs for that year;

C) MCPS is DIRECTED TO REIMBURSE the Schaffers for Brian's full tuition for said school year;

2) Plaintiffs' Cross–Motion for Summary Judgment (Paper No. 51) is DENIED;

3) Defendants' Motion for Preliminary Injunction (Paper No. 41) is DENIED;

4) All other pending Motions are MOOT;

5) Final judgment is ENTERED in favor of Defendants herein;

6) Counsel for the parents may submit an appropriate Petition for Fees.